# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SOUTHWESTERN BELL TELEPHONE,   )
L.P., d/b/a SBC MISSOURI,   )
  )
     Plaintiff,   )
  )
     v.   )      No. 4:05-CV-1264 CAS
  )
THE MISSOURI PUBLIC SERVICE   )
COMMISSION, et al.,   )
  )
     Defendants.   )

## MEMORANDUM AND ORDER

This action was filed by Southwestern Bell Telephone, L.P., d/b/a SBC Missouri ("SBC")

seeking declaratory and injunctive relief under the Federal Telecommunications Act of 1996.[1] The

matter is before the Court on a motion to dismiss for lack of subject matter jurisdiction, two motions

to strike, and motions for summary judgment filed by SBC and defendants Sprint Communications

Company, L.P. and Charter Fiberlink-Missouri, LLC. The Court concludes that it has subject matter

jurisdiction over this action, the motions to strike should be denied, plaintiff SBC's motion for

summary judgment should be granted in part and denied in part, defendant Sprint Communications

Company, L.P.'s motion for summary judgment should be granted, and defendant Charter Fiberlink-

Missouri, LLC's motion for summary judgment should be denied.

---

[1]The Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (codified as
amended in scattered sections of 47 U.S.C.).

After this action was filed, SBC Communications, the parent company of plaintiff
Southwestern Bell Telephone, L.P., merged with AT & T Corp. to form AT & T Inc. Plaintiff now
does business as AT & T Missouri.

# I.

## Introduction and Regulatory Framework.

By enacting the Telecommunications Act of 1966 (the "Act"), "Congress entered what was primarily a state system of regulation of local telephone service and created a comprehensive scheme of telecommunications regulation administered by the Federal Communications Commission." Indiana Bell Tel. Co. v. Indiana Utility Regulatory Comm'n, 359 F.3d 493, 494 (7th Cir. 2004). While state utility commissions have a role in carrying out the Act, the Supreme Court of the United States has stated that the Act "unquestionably" took "regulation of local telecommunications competition away from the States." AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 378 n.6 (1999).

The Supreme Court has described the fundamental change effected by the Act in telephone markets as follows:

> Until the 1990's, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC),[2] which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network. Technological advances, however, have made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies.

> The Telecommunications Act of 1996 . . . fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC's obligation under 47 U.S.C. § 251(c) to share its network with competitors. Under this provision, a requesting carrier can obtain access to an incumbent's network in three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of

---

[2]"Local exchange carriers are companies that provide local telephone service." Global NAPs, Inc. v. Verizon New England, Inc., 454 F.3d 91, 93 n.1 (2d Cir. 2006).

the incumbent's network "on an unbundled basis"; and it can interconnect its own facilities with the incumbent's network.  When an entrant seeks access through any of these routes, the incumbent can negotiate an agreement without regard to the duties it would otherwise have under § 251(b) or § 251(c).  See § 252(a)(1).  But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder.

AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371-73 (1999) (footnote added).

"To facilitate the entry of competing carriers into the market for local [telephone] service, the Act requires that incumbent carriers provide 'interconnection' and other wholesale services to the competing carriers on a non-discriminatory basis."  Indiana Bell, 359 F.3d at 495.  "Sections 251 and 252 of the Act lay out a process for reaching 'interconnection agreements' by which competing carriers can gain interconnection with the incumbent carrier's networks, facilities and services."  Id.

Among the duties that apply to incumbent local exchange carriers ("ILECs")[3] is the obligation to lease certain parts of their networks to competitors at regulated rates.  See 47 U.S.C. § 251(c)(3).  Before a network facility is required to be made available under this provision, however, the Federal Communications Commission ("FCC") must determine that competitors are "impaired" without access to it.  Id., § 251(d)(2).  A facility that the FCC has determined must be made available under this provision is known in the telecommunications industry as an "unbundled network element," or "UNE."[4]

---

[3]ILECs are those dominant local exchange carrier companies that "were providing local phone service in an area on February 8, 1996, the date the Telecommunications Act became law." Competitive Telecommc'ns Ass'n v. FCC, 117 F.3d 1068, 1071 (8th Cir. 1997); see 47 U.S.C. § 251(h)(1).  SBC is the ILEC in Missouri.

[4]The Act defines "network element" as "a facility or equipment used in the provision of a telecommunications service.  Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or

UNE components include "loops," "switches," and "transport facilities." Loops are copper wires that connect a home or business to the local phone company switch. A switch is a device, usually software, that routes a call from a home or office to the intended recipient. Transport facilities are devices such as copper wires or fiberoptic cables that transport calls between switches. A UNE Platform is a combination of all the network elements required to provide local telephone service, required to be offered in a pre-packaged form that permits competing local exchange carriers ("CLECs") to provide telephone service with no actual switching, loop or transport facilities of their own. See Peter W. Huber, et al., Federal Telecommunications Law §2.7.4 at 123 (2d ed. Cum. Supp. 2004).

Rates that ILECs can charge for UNEs must be based on cost. 47 U.S.C. § 252(d)(1). The FCC has implemented this directive by a pricing methodology known as "total element long-run incremental cost," or TELRIC. See Local Competition Order,[5] 11 F.C.C.R. at 15,844, ¶ 672. TELRIC allows access to UNEs at very low rates, and has been upheld by the Supreme Court as the pricing methodology used under certain portions of the Act. Verizon Commc'ns Inc. v. FCC, 535 U.S. 467, 489 (2002).

The duties of § 251 are implemented through "interconnection agreements" between ILECs and CLECs. See 47 U.S.C. § 252. The Act requires ILECs and CLECs to negotiate in good faith

---

other provision of a telecommunications service." 47 U.S.C. § 153(29). "The term 'unbundled' means that the incumbent LEC must 'give separate prices' for the competitor's use of each element instead of charging the competitor one price for the entire basket of network elements that it uses." Sprint's Mem. Supp. Mot. Summ. J. at 3, nn. 2-3 (internal punctuation omitted) (citing AT & T Corp., 525 U.S. at 394).

[5]First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499 (1996) ("Local Competition Order") (subsequent history omitted).

the terms and conditions of agreements to fulfill the duties described in §§ 251(b) and (c). <u>Id.</u>, § 251(c)(1). If negotiations are unsuccessful, either party may ask the appropriate state public utility commission to arbitrate "any open issues" the parties have been unable to resolve. <u>See</u> <u>id.</u>, § 252(b). In deciding these "open issues," the state commission must adhere to the requirements of the statute and the FCC's implementing regulations. <u>Id.</u>, § 252(c).

The Eleventh Circuit recently described the history of the FCC's efforts to implement a regulatory scheme under the Act, which ultimately resulted in the FCC's Triennial Review Remand Order ("TRRO").[6] Under the TRRO, the FCC no longer required unbundled access to certain network elements under § 251 and established a transition plan for the telecommunications industry to implement the new regulations:

> For eight years, the FCC tried and failed to implement a regulatory scheme that, after review by federal courts, satisfied the 1996 Act. For most of those eight years, the FCC required unbundling on the theory that it enhanced competition. The FCC required ILECs and CLECs to enter "voluntary" agreements to provide unbundled access to local telephone networks. If the parties could not agree, an agreement was provided either by the FCC or by state commerce commissions. States were given the authority to oversee voluntary agreements and arbitrate disputes arising from those agreements. 47 U.S.C. § 252(a), (b).
>
> . . . .
>
> In 2004, in a challenge to the FCC scheme filed by ILECs, the D.C. Circuit vacated the second attempt of the FCC to implement the directive of Congress regarding local phone service. <u>See</u> <u>U.S. Telecom Ass'n v. FCC</u>, 359 F.3d 554 (D.C. Cir. 2004). The D.C. Circuit concluded, in part, that the unbundling regime enacted by the FCC was not based on a rational analysis of whether "CLECs are impaired in the mass market without unbundled access to ILEC switches." <u>Id.</u> at 569. The D.C. Circuit also expressed some frustration regarding the "failure [of the FCC], after eight years, to develop lawful unbundling rules, and its apparent unwillingness to adhere to

---

[6]Order on Remand, <u>In the Matter of Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers</u>, 20 F.C.C.R. 2533 (2005).

prior judicial rulings." Id. at 595.  In response to the ruling of the D.C. Circuit, the FCC issued interim rules that preserved the status quo ante while the FCC wrote new rules, and the FCC established a transition period, ending in early 2005, in which only existing customers could be served through UNEs.

In February 2005, the FCC released its Triennial Review Remand Order (TRRO), which stated that the unbundling of certain "UNE-Platform" (UNE-P) elements harmed competition by discouraging innovation.  To redress that harm, the FCC stated that ILECs would no longer be obliged to provide CLECs "with unbundled access to mass market local switching," and the FCC provided more limited relief from unbundling for loops and transport.  The FCC stated that existing, or "embedded," customers could continue to have access to UNE-Ps for up to twelve months, although at higher rates.  The FCC also required CLECs to submit orders within one year to convert embedded UNE-P customers to "alternative arrangements."  During the transition period, the FCC banned new orders for unbundled access to local mass market switching: "This transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new customers using unbundled access to local circuit switching."  The FCC required both ILECs and CLECs to negotiate, under the change-of-law provisions in their contracts, any "necessary" changes to the interconnection agreements: "We expect that [carriers] will implement [our] findings . . . .  Thus, carriers must implement changes to their interconnection agreements consistent with our conclusions in this Order . . . .  Thus, [carriers] must negotiate in good faith regarding any rates, terms, and conditions necessary to implement our rule changes."  Based on the "need for prompt action," the FCC stated that the TRRO was effective on March 11, 2005.

Bellsouth Commc'ns, Inc. v. MCIMetro Access Trans. Servs., LLC, 425 F.3d 964, 967 (11th Cir.

2005).

**1. Section 271 Requirements**.

In Section 271, the Act imposes a separate set of affirmative duties on the Bell Operating

Companies ("BOCs") that were divested from AT & T in the consent decree entered in the anti-trust

suit brought in the 1970s by the U.S. Department of Justice.  See United States v. American Tel. &

Tel. Co., 552 F. Supp. 131 (D.D.C. 1982), aff'd sub nom Maryland v. United States, 460 U.S. 1001

(1983) ("AT & T case").  These duties were imposed by Congress as a condition of removing the ban

in the final judgment in the AT & T case which prohibited BOCs from providing long distance

services. "Section 271 sets out the factors the FCC evaluates in deciding whether to grant the application of an [ILEC] carrier to enter the long-distance market." Indiana Bell, 359 F.3d at 495. "Part of the process is directed at ensuring that the applicant is facilitating competition in the market for local services before it is allowed to enter the long-distance market." Id.

Among the § 271 obligations is a list of fourteen competitive "checklist" items that BOCs must provide to CLECs to ensure that the market for local services is irreversibly open to competition. See 47 U.S.C. § 271(c)(2)(B).[7] The checklist items include: "Local loop transmission from the central office to the customer's premises, unbundled from local switching or other services," id., § 271(c)(2)(B)(iv); "[l]ocal transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services," id., § 271(c)(2)(B)(v); and "[l]ocal switching unbundled from transport, local loop transmission, or other services." Id., § 271(c)(2)(B)(vi).

Under § 271, if BOCs such as SBC wish to offer long-distance service, they must provide CLECs with access to certain of their network elements even though they may no longer be required to provide those elements to the CLECs under § 251. Section 271 creates an obligation for BOCs to make network elements available to competitors which is independent of the ILECs' obligations under § 251. A key difference between the unbundling obligations of § 251 and the checklist obligations of § 271 is the price that CLECs must pay for the network elements: Under § 271,

---

[7]"Section 271 of the Telecommunications Act appears in a section entitled 'Special Provisions Concerning Bell Operating Companies,' 47 U.S.C. §§ 271 to 276, which applies only to Bell Operating Companies (BOCs), all of which were formerly part of AT & T. Section 271 concerns the authority of BOCs to provide long distance services and provides, in general, that a BOC can only provide long distance services if it first meets certain requirements relating primarily to interconnection. 47 U.S.C. § 271(c)." Bellsouth Telecommc'ns, Inc. v. Mississippi Public Serv. Comm'n, 368 F.Supp.2d 557, 566 n.10 (S.D. Miss. 2005).

network elements are to be provided at a "just and reasonable rate," rather than at the low, cost-based TELRIC required by § 251. See Triennial Review Order ("TRO"), 18 F.C.C.R. at 17,389, ¶ 664.[8]

**2. Role of State Public Utility Commissions**.

The Act specifically delegates certain responsibilities to state public utility commissions such as the Missouri Public Service Commission ("MPSC"). The Act requires that "the participation of state commissions in the new federal regime be guided by federal-agency regulations." Indiana Bell, 359 F.3d at 494 (citing AT & T Corp., 525 U.S. at 378 n.6). Relevant to this case, "state commissions have a role in helping to negotiate and arbitrate interconnection agreements if private negotiations fail to produce a complete agreement within a specific period of time." Id.; 47 U.S.C. § 252(a), (b). "Before any interconnection agreement may be implemented, the state commission must approve it." Id., § 252(e)(1). State commissions are also authorized to establish rates for interconnection, services or network elements for purposes of §§ 251(c)(2) and (3). See 47 U.S.C. §§ 252(c), (d).

In addition, § 271(d) requires the FCC to "consult" with state commissions to verify a BOC's compliance with § 271(c) competitive checklist items. See 47 U.S.C. §§ 271(c) and (d). "The state commission makes a recommendation, which is merely advisory, as to whether the BOC has satisfied the requirements. The Act reserves to the FCC the authority to decide whether to grant a section 271 application." Indiana Bell, 359 F.3d at 495.

---

[8]Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 F.C.C.R. 16,978 (2003) (subsequent history omitted) ("TRO").

### 3. Factual and Procedural Background.

In 2001, plaintiff SBC, the incumbent Local Exchange Carrier ("ILEC") in Missouri, offered a standard interconnection agreement to its competitors. A number of the competitors entered into the standard agreements, which were approved by the MPSC pursuant to 47 U.S.C. § 252(e). The standard interconnection agreements were set to expire in March 2005. In late 2004 SBC attempted to negotiate new agreements with its competitors, but the parties were unable to reach complete agreement on all issues. As required by the Act, SBC petitioned the MPSC to arbitrate the agreements pursuant to § 252.

The arbitrator filed a Final Arbitrator's Report on June 21, 2005, consisting of some 2,075 pages. SBC and some of the CLECs filed comments and objections to the Final Arbitrator's Report on June 24, 2005. The MPSC heard oral arguments on the comments on June 29 and 30, 2005, and issued an Arbitration Order (the "Arbitration Order") on July 11, 2005. The Arbitration Order adopted the Final Arbitrator's Report as the MPSC's decision on each unresolved issue, except to the extent the Arbitration Order specifically modified the Final Arbitrator's Report. On July 19, 2005, SBC sought rehearing of the Arbitration Order, asserting that it was contrary to federal law in certain respects. On August 3, 2005, as required by the Arbitration Order, SBC and the CLECs submitted interconnection agreements that conformed to the terms of the Arbitration Order. The MPSC approved these agreements, but in doing so did not address the issues raised by SBC in its rehearing petition.

SBC then filed this action, citing 47 U.S.C. § 252(e)(6), 28 U.S.C. § 1331, the Supremacy Clause of the United States Constitution, and 28 U.S.C. § 1367 as the bases for jurisdiction. The defendants are the MPSC, its individual members in their official capacities, and a number of

competing local exchange carriers. SBC contends the Arbitration Order requires it to provide competitors with access to SBC's telecommunications network well beyond the access authorized by FCC regulations. SBC contends the Arbitration Order is preempted by applicable FCC regulations because the MPSC has ordered it to provide network elements in contravention of the FCC's binding regulations, and because the MPSC cannot require that terms and conditions for § 271 checklist items be included in SBC's interconnection agreements with CLECs.

SBC moved for a preliminary injunction to enjoin the Arbitration Order to the extent it authorizes CLECs to place new UNE Platform orders in violation of the "nationwide bar" on such new orders contained in the FCC's TRRO. Rather than contesting SBC's motion, but without conceding its validity, the MPSC and the defendant CLECs stipulated to the entry of a preliminary injunction pending further orders of the Court. See Doc. 43.

## II.

## **Motion to Dismiss for Lack of Subject Matter Jurisdiction**.

As a preliminary matter, the Court must address its jurisdiction to hear this matter. The MPSC moves to dismiss this case for lack of subject matter jurisdiction on the basis that it does not arise under the laws or Constitution of the United States as required for federal question jurisdiction under 28 U.S.C. § 1331. The MPSC contends that SBC's alleged statutory basis for jurisdiction, 47 U.S.C. § 252(e)(6), is not applicable in this case because § 252(e)(6) of the Act provides federal jurisdiction only where a state commission makes a determination under *that section*, and the Arbitration Order at issue here was not a determination under § 252 of the Act, but rather under §§ 271-72.

SBC responds that MPSC's position is directly contrary to the Supreme Court's holding in Verizon Maryland, Inc. v. Public Service Commission, 535 U.S. 635 (2002), which establishes that federal district courts have jurisdiction under 28 U.S.C. § 1331 over complaints such as SBC's, containing claims that a state commission violated the Act and FCC rulings. The MPSC did not file a reply memorandum.

The Court concludes that it has jurisdiction over this action. In Verizon Maryland, the Supreme Court held that 28 U.S.C. § 1331 gave the federal district court a basis for jurisdiction to review a claim that a State commission violated federal law in determining that an interconnection agreement included calls placed to Internet Service Providers as local calls subject to a reciprocal arrangement. Verizon Maryland, 535 U.S. at 643-44. The Court declined to address whether 47 U.S.C. § 251(e)(6) gives federal courts power to review state commissions' interpretation of an interconnection agreement, but held that because the plaintiff's complaint alleged the state commission "violated the [Telecommunications] Act and [an] FCC ruling" and sought declaratory and injunctive relief against the state commission's decision, "federal courts have jurisdiction under § 1331 to entertain such a suit." Id. at 642. The Court explained that when a party seeks relief from a state commission order "on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail . . . its claim thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." Verizon Maryland, 535 U.S. at 642 (internal quotation marks and citation omitted).

Subsequent Eighth Circuit decisions have held that under Verizon Maryland, federal district courts have subject matter jurisdiction "to determine whether a state administrative agency correctly interprets federal law, in this case the Telecommunications Act and the FCC regulations interpreting

the Act." Rural Iowa Indep. Tel. Ass'n v. Iowa Utilities Bd., 362 F.3d 1027, 1030 (8th Cir. 2004)

(citing Verizon Maryland, 535 U.S. at 643-44); see also Iowa Network Servs., Inc. v. Qwest Corp.,

363 F.3d 683, 691-92 (8th Cir. 2004) (citing Verizon Maryland in support of the conclusion that

jurisdiction exists under § 1331 to review state commission orders for compliance with federal law).

Because SBC alleges that the MPSC's decisions violate federal Law, see Complaint ¶¶ 43, 49-51, this

Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**Motions to Strike**.

The MPSC filed two motions to strike portions of pleadings as immaterial, one directed to

SBC's complaint, and the other directed to the counterclaim/cross-claim filed by defendant Charter

Fiberlink-Missouri, LLC ("Charter").

MPSC asserts that nineteen paragraphs in SBC's complaint and eighteen paragraphs in

Charter's counterclaim/cross-claim violate the "simple, concise and direct" requirement of Rule

8(e)(1), Federal Rules of Civil Procedure, because these pleadings contains "several long and intricate

legal arguments that are appropriately raised in a dispositive pleading or brief." Mots. to Strike, ¶

2. MPSC cites no case law in support of its motions and does not provide any further information

concerning the contents of the paragraphs at issue.

Under Federal Rule of Civil Procedure 12(f), a court may "order stricken from any pleading

any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions

to strike are not favored and are infrequently granted, because they propose a drastic remedy.

Stanbury Law Firm v. Internal Revenue Service, 221 F.3d 1059, 1063 (8th Cir. 2000). Nonetheless,

resolution of such a motion lies within the broad discretion of the Court. Id. Matter will not be

stricken unless it clearly can have no possible bearing on the subject matter of the litigation. 2 James

W. Moore, et al., Moore's Federal Practice §12.37[3] (3rd ed. 2006). If there is any doubt whether the matter may raise an issue, the motion should be denied. Id. If allegations are redundant or immaterial, they should be stricken only if prejudicial to the moving party. Id.

In this case, MPSC has not met its burden to establish that the challenged paragraphs have "no possible bearing" on the subject matter of the litigation. In addition, MPSC has not alleged, must less established, that any of the paragraphs it seeks to strike are prejudicial to it. MPSC's motions to strike should therefore be denied.

## III.

**SBC's Motion for Summary Judgment**.

SBC's motion for summary judgment raises some but not all of the claims asserted in its complaint.[9] SBC asks the Court to vacate the MPSC's orders to the extent they require SBC to (1) provide access to unbundled switching and the UNE Platform pursuant to § 271 of the Act; (2)

---

[9] Because this is an administrative appeal, the Court is sitting as an appellate tribunal reviewing the decision of an agency, rather than performing its traditional role as a trial level court. Optimal Data Corp. v. United States, 17 Cl. Ct. 723, 727 (1989). In an administrative appeal, the burden of proof is on the plaintiff to demonstrate that the administrative ruling is erroneous. Ringsred v. Dole, 828 F.2d 1300, 1302 (8th Cir. 1987). In an appeal where, as here, the issues are to be decided on briefs, SBC was required to make its case in its initial brief. Disabled American Veterans v. Gober, 234 F.3d 682, 688 (Fed. Cir. 2000) (in an administrative appeal, an issue not raised by the plaintiff in its opening brief is waived). To the extent SBC has not moved for summary judgment on other claims asserted in its complaint, those claims are abandoned and denied. See GTE South Inc. v. Morrison, 6 F.Supp.2d 517, 526 (E.D. Va. 1998) ("To secure summary judgment, a party must assert the grounds alleged in the complaint; otherwise, they are deemed abandoned."), aff'd 199 F.3d 733 (4th Cir. 1999); see also MCI Telecommc'ns Corp. v. GTE Northwest, Inc., 41 F.Supp.2d 1157, 1186 (D. Or. 1999) (claims not briefed deemed abandoned). The applicable Case Management Order provided that SBC "will file a motion for summary judgment on all issues raised in its complaint . . . ."). See Doc. 83 at 2, ¶ 6. Moreover, SBC expressly agreed to present a motion for summary judgment "on all issues" raised in its complaint, and acknowledged, as did all parties, that denial of its motion for summary judgment would resolve its claim. See First Amended Joint Proposed Scheduling Order, ¶ 4 [Doc. 82].

provide unbundled access to high-capacity loops and transport, dark fiber loops and sub-loops, and entrance facilities under § 271 of the Act, in circumstances where the FCC has held that these facilities need not be unbundled pursuant to § 251(c)(3) the Act; and (3) treat interexchange calls as subject to reciprocal compensation rather than access charges, where the calls originate in the "Internet Protocol" format. SBC asserts that the MPSC should be enjoined from imposing or enforcing these same obligations in any other agreements involving SBC.

SBC challenges the MPSC's Arbitration Order in two principal areas. First, SBC asserts that the Arbitration Order violates binding FCC decisions limiting the network facilities that state commissions can require incumbent carriers such as SBC to provide at regulated rates to their competitors. Simply put, SBC contends that the network-access requirements imposed by the MPSC have been deemed unlawful by the FCC. SBC also asserts that the MPSC purported to act pursuant to a statutory provision over which the FCC has exclusive authority, 47 U.S.C. § 271, and therefore exceeded its jurisdiction. The defendants responds that the MPSC acted within its jurisdiction under § 271 to include the network-access requirements challenged by SBC.

Second, SBC asserts that the MPSC erred in determining the compensation that applies when SBC and its competitors exchange traffic that a competitor has converted from an Internet Protocol format to standard analog format. SBC contends the MPSC's analysis on this issue is directly contrary to federal law and is completely unreasoned, as the MPSC offered no substantive rationale in support of its decision. The defendants respond that the MPSC correctly determined that reciprocal compensation applies to such calls rather than higher-fee access charges, and adequately explained its reasoning.

**1. Standard of Review**.

In actions such as this one, federal district courts apply <u>de</u> <u>novo</u> review to state commissions' interpretation and application of federal law, and apply a deferential "arbitrary and capricious" review standard to the commissions' factual determinations and mixed questions of law and fact. <u>See</u> <u>WWC License, L.L.C. v. Boyle</u>, No. 05-1725, 2006 WL 2419162, *6 , __ F.3d __ (8th Cir. Aug. 23, 2006) (citing cases). SBC's challenges to the MPSC's actions primarily allege that the MPSC misinterpreted or misapplied federal law, and therefore are subject to <u>de</u> <u>novo</u> review.

**2. Discussion**.

**A. MPSC Jurisdiction Over § 271 Elements**.

In the Arbitration Order, the MPSC recognized that under binding FCC regulations, ILECs such as SBC are no longer required under § 251 to offer CLECs unbundled access to local switching, high-capacity loops, dedicated transport, OCn and dark fiber loops, and dark fiber and feeder subloops.[10] Nonetheless, the MPSC required SBC to provide CLECs with unbundled access to certain of these network elements under § 271. The Arbitration Order recognized that while unbundled access to these UNEs was proper at TELRIC rates under § 251, access to the same UNEs under § 271 is proper only at the "just and reasonable" rate standard established under §§ 201 and 202 of the Act. The MPSC concluded that it had authority to enforce the FCC's "just and reasonable" pricing standard for § 271 UNEs, and adopted rates patterned on the FCC's transition period rates for declassified § 251 UNEs, on an interim basis. <u>See</u> Arbitration Order at 28-30.

---

[10]"Dark fiber consists of unused fiber within an existing fiber optic cable that has not been activated through optronics to make it capable of carrying communications services. Users of unbundled dark fiber loops furnish their own electronic equipment to activate the dark fiber strands to provide voice and data services." <u>Verizon New England Inc v. Maine Public Util. Comm'n</u>, No. 05-53-B-C, 2006 WL 2007655, *3 n.8 (D. Me. July 18. 2006).

The gravamen of SBC's complaint is that the MPSC erroneously concluded it had the jurisdiction and authority to order § 271 unbundling obligations to be included in an interconnection agreement arbitrated pursuant to § 252, where SBC had not agreed to negotiate access to these facilities pursuant to § 251. SBC contends that the statute gives jurisdiction over enforcement of § 271 exclusively to the FCC. SBC also contends that the Arbitration Order requires it to provide CLECs with the UNE Platform in direct contravention of the FCC's ruling in the TRRO, and therefore creates a substantive conflict with federal law and is preempted. Finally, SBC asserts that even if the MPSC had jurisdiction to issue the rulings concerning UNEs, it did not have the authority to set regulated rates, as "just and reasonable" rates contemplate a market price arrived at through negotiations between SBC and the CLECs.

The MPSC and the Coalition defendants[11] separately respond that the MPSC properly exercised its duties under §§ 271 and 272 of the Act and correctly ordered SBC's interconnection agreements with CLECs to include terms and conditions for the § 271 checklist items SBC is required to make available to its competitors – local switching, local loops and local transport. The Coalition defendants contend that SBC's obligation to make portions of its network available to CLECs on an unbundled basis exists under two distinct sections of the Act, § 251 and § 271, and note that § 271 explicitly requires the § 271 checklist items to be included in § 252 interconnection agreements. The Coalition defendants contend that approval of terms and conditions for § 271 checklist elements does

---

[11]The Coalition defendants are defendants Big River Telephone Company, LLC, Nuvox Communications of Missouri, Inc., Socket Telecom, LLC, XO Communications Services, Inc., Xspedius Management Co. of Kansas City, LLC, and Xspedius Management Co. Switched Services, LLC. Separately, defendant WilTel Local Network, LLC joined in the Coalition defendants' opposition memorandum. See Doc. 100.

not constitute "enforcement" of SBC's § 271 elements by the MPSC, and that the MPSC's Arbitration Order is therefore not preempted by the FCC's regulatory scheme.

As stated in the introductory section of this opinion, the Act completely changed the primarily state system of regulation of local telephone service and created a comprehensive, federally-administered scheme of telecommunications regulation. See Indiana Bell, 359 F.3d at 494. The Act took "regulation of local telecommunications competition away from the States," AT & T Corp., 525 U.S. at 378 n.6, as "Congress transferred broad authority from state regulators to federal regulators, even while it left corners in which the states had a role." Indiana Bell, 359 F.3d at 497. "The new regime for regulating competition [under the Act] is federal in nature . . . and while Congress has chosen to retain a significant role for state commissions, the scope of that role is measured by federal, not state, law." Southwestern Bell Tel. Co. v. Connect Commc'ns Corp., 225 F.3d 942, 947 (8th Cir. 2000).

The issue here is whether the MPSC's action is permissible under the Act, or whether the MPSC has overstepped its prescribed role. For the following reasons, the Court concludes that the MPSC's actions were without jurisdiction and are preempted by the Act.

The text of § 271 gives the FCC exclusive jurisdiction over the enforcement of that section. Section 271 provides that BOC applications to provide long-distance services are submitted to the FCC, which has sole authority to grant the applications. See §§ 271(b)(1), (d)(1), (d)(3). The only role Congress delegated to state commissions under § 271 is to act as consultant to the FCC during the application process. See § 271(d)(2)(B). Where a BOC has already received approval to provide long-distance services, the statute places exclusive enforcement of any ongoing obligations with the FCC. Id., § 271(d)(6). If the FCC determines that a BOC is no longer meeting § 271's requirements,

it may order the BOC to correct any deficiencies, impose a penalty, or suspend or revoke the BOC's § 271 approval. 47 U.S.C. § 271(d)(6)(A).

Section 271 does not contain an express provision for rate-making or rate-making authority, but provides that a BOC must provide the competitive checklist items of § 271(c)(2)(B) at "just and reasonable rates." In contrast, § 252 explicitly authorizes state commissions to set "just and reasonable" rates for interconnection and network element charges under §§ 251(c)(2) and (3). Section 252 provides that the state commission's duty in arbitrating and approving agreements is limited to ensuring that the agreement "meets the requirements of section 251," and does not mention any role for the state commission under § 271. See 47 U.S.C. §§ 252(c)(1), (3)(2)(B).

In a different context than presented by this case, the FCC has recognized that Congress granted "sole authority to the [FCC] to administer . . . section 271." InterLATA Boundary Order, 14 F.C.C.R. at 14,400-01, ¶¶ 17-18.[12] Two federal district courts have commented, also in a different context, that enforcement authority for § 271 unbundling duties lies with the FCC and must be challenged there first, and that federal courts are not the appropriate forum to address such issues in the first instance. See BellSouth Telecommc'ns, Inc. v. Mississippi Public Serv. Comm'n, 368 F.Supp.2d 557, 565 (S.D. Miss. 2005); BellSouth Telecommc'ns, Inc. v. Cinergy Commc'ns Co., 2006 WL 695424, No. 03:05-CV-16-JMH, slip op. at 12 (E.D. Ky. 2005).

A third federal district court recently concluded that the New Hampshire public utilities commission lacked the authority to set rates for § 271 UNE elements, and that the commission's use of TELRIC rates for these elements directly conflicted with the FCC's rulings. See Verizon New

_____

[12]In the Matter of Application for Review and Petition for Reconsideration or Clarification of Declaratory Ruling Regarding U.S. West Petitions to Consolidate LATAs in Minnesota and Arizona, 14 F.C.C.R. 14,392 (1999) ("InterLATA Boundary Order").

England, Inc. v. New Hampshire Public Util. Comm'n, No. 05-CV-94-PB, slip op. at 24-29 & n.33 (D.N.H. Aug. 22, 2006). Unlike the MPSC in the present case, the New Hampshire state commission did not argue that federal law authorized it to set § 271 rates. Rather, it contended that Verizon agreed to submit its § 271 rates to the commission. Id. at 25-26. The court rejected this factual contention and concluded that the commission had exceeded its jurisdiction in setting rates under § 271. Id. at 26-29. But see Verizon New England, Inc. v. Maine Public Utilities Comm'n, 403 F.Supp.2d 96, 102-03 (D. Me. 2005) (holding that Maine law authorized the state commission to require ILEC to offer network elements under § 271 and to set the prices of such offerings).

Although the decisions of state public utility commissions are not unanimous, numerous state commissions have concluded that they lack jurisdiction or authority to include § 271 checklist items or to order § 271 unbundling as part of arbitrated interconnection agreements, or to set rates for these items. See SBC Reply, Ex. 2 [Doc. 103].

The MPSC and the CLEC defendants rely on § 271(c)(1) and (c)(2) as providing authority for the MPSC's inclusion of § 271 elements and rate-setting for these elements in the interconnection agreements. Subsections (c)(1) and (c)(2) provide that to obtain initial § 271 approval, a BOC must show that it is providing the relevant services under "one or more binding agreements that have been approved under section 252." 47 U.S.C. § 271(c)(1)(A). The CLEC defendants' argument is based on the Act's requirements that: (1) terms and conditions for § 271 checklist items must be contained in an approved interconnection agreement, (2) such interconnection agreements must be approved under § 252, and (3) § 252 approval is granted exclusively by state commissions as part of the statutory negotiation and arbitration process. The CLECs therefore argue that "[i]nclusion of the 'approved under section 252' language means that the agreements incorporating § 271 checklist

elements are subject to the § 252 state commission arbitration process if the parties do not reach agreement, as well as subject to state commission review and approval if negotiated by the parties." CLEC Defs.' Mem. Opp. to SBC's Mot. for Summ. J. at 13.

Section 271(c)(1) does not, however, provide authority to state commissions to arbitrate disputed terms or to set rates during an arbitration. Instead, the statute limits state commission arbitration and rate-setting authority to items required under § 251. SBC argues persuasively that it could satisfy the requirements of § 271(c)(1)(A) by pointing to a single, voluntarily negotiated agreement, approved by a state commission, pursuant to which SBC would make available the items on the competitive checklist, including switching, at a just and reasonable rate. Therefore, the limited statutory reference to state commission approval under § 252 cannot vest authority in the MPSC to set the rates for all § 271 checklist items, and is not properly understood as an implied grant of arbitration or rate-making authority.

For these reasons, the Court concludes that the MPSC lacks the jurisdiction and authority to order § 271 unbundling obligations to be included as part of an interconnection agreement arbitration pursuant to § 252, where SBC has not agreed to negotiate access to these facilities pursuant to § 251. The Court declines to follow Verizon New England, Inc. v. Maine Public Utilities Comm'n, which concluded that state commissions have the authority to require § 271 elements in interconnection agreements and to set rates under § 271. See 403 F.Supp.2d at 102. The decision cites no federal-law grant of authority to support its conclusion, but rather implies it from § 271's silence with respect to rate-making authority and relies on Maine law as a source of authority. This reasoning is contrary to the FCC's rulings and the decisions of most state commissions, and fails to adequately acknowledge the Act's transfer of the regulation of local telecommunications competition from the

states to the FCC. <u>AT & T Corp.</u>, 525 U.S. at 378 n.6. Under the current regulatory scheme, "while Congress has chosen to retain a significant role for state commissions, the scope of that role is measured by federal, not state, law." <u>Southwestern Bell</u>, 225 F.3d at 947.

The Court concludes that the Arbitration Order's requirement that SBC include § 271 unbundling obligations in its interconnection agreements is beyond the jurisdiction of the MPSC. This aspect of SBC's motion for summary judgment should therefore be granted.

### B. Unbundled Switching and UNE Platform.

Separate from the issue of the MPSC's jurisdiction to impose obligations on SBC under § 271, SBC argues that the substantive obligations imposed in the Arbitration Order contravene the clear intent of the FCC as expressed in the TRRO, and are therefore preempted. Specifically, SBC contends that the MPSC's requirement that it combine switching, which is only required under § 271, with facilities required under § 251 creates the same substantive combination as the UNE Platform and is directly contrary to the FCC's holding. The Court agrees.

As stated in the introduction of this opinion, the FCC in its 2005 Triennial Review Remand Order ("TRRO") prohibited the mandatory leasing of unbundled switching, which is necessary for the UNE Platform, at TELRIC rates. The FCC explained that competitors were not impaired without unbundled switching and further determined that the availability of the UNE Platform hindered genuine competition. TRRO, 20 F.C.C.R. at 2653, ¶¶ 218, 220. The FCC adopted a "nationwide bar" on the mandatory unbundling of local switching. <u>Id.</u> at 2644, ¶ 204. Because of the "need for prompt action," the FCC made its new rules effective on March 11, 2005. <u>Id.</u> at 2666, ¶ 235.

The FCC also created a twelve-month transition period, beginning on that same effective date, during which CLECs could continue to use unbundled mass market switching, and thus the UNE Platform, but only to serve existing mass market customer lines. <u>See id.</u> at 2659-61, ¶¶ 226-28.

CLECs were not permitted to place new orders for unbundled switching and the UNE Platform as of the TRRO's March 11, 2005 effective date.  Id. at 2641, ¶ 199.  During the twelve-month transition period, ILECs were to receive an additional dollar per line per month over prior UNE Platform rates.  Id. at 2660, ¶ 228 n.630.  These transition rules and the transition rate applied "only to the embedded [i.e., existing] customer base" and did "not permit competitive LECs to add new UNE Platform arrangements using unbundled access to local circuit switching pursuant to section 251(c)(3)."  TRRO at 2659-60, ¶ 227.

The FCC also held that facilities which are required only under § 271, unlike UNEs required under § 251, need not be provided in combined, pre-packaged form.  See Triennial Review Order,[13] 18 F.C.C.R. at 17,386, ¶ 655 n.1990 ("We decline to require BOCs, pursuant to section 271, to combine network elements that no longer are required to be unbundled under section 251."), vacated in part and remanded in part by United States Telecom Ass'n v. FCC, 359 F.3d 554, 589-90 (D.C. Cir.) ("USTA II") (affirming FCC's finding that the no-combination ruling was an "important respect[]" in which § 251 and § 271 differ), cert. denied, 543 U.S. 945 (2004).

The Arbitration Order permits CLECs to use the same combination of facilities which comprise the UNE Platform, without limitation and at the same transitional rates the FCC held should apply only to the embedded customer base.  See Arbitration Order at 28-30.  The Arbitration Order therefore conflicts with substantive restrictions the FCC has placed on UNE access, and accordingly is preempted.  See 47 U.S.C. §§ 251(d)(3), 261(b)-(c) (precluding state commission actions that are not "consistent" with federal law).

_____

[13]Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 F.C.C.R. 16978 (2003) (subsequent history omitted) ("TRO").

The analysis does not change because the MPSC purported to act pursuant to § 271 rather than § 251. The FCC has held that if a state commission decision in substance reimposes an unbundling decision that the FCC found improper under § 251, that decision is preempted regardless of whether the commission purports to be imposing a § 251 obligation. See Memorandum Opinion & Order, BellSouth Telecommc'ns, Inc. Request for Declaratory Ruling, 20 F.C.C.R. 6830, ¶¶ 25-26 (2005) (state commission's decision to require unbundled access to a network element that the FCC expressly declined to unbundle directly conflicted with and was inconsistent with the FCC's rules and policies implementing § 251 and was preempted).

Therefore, the Court concludes that the Arbitration Order conflicts with and is preempted by federal law to the extent it requires SBC to provide unbundled access to switching and the UNE Platform.

### C. Unbundled Access to Other Network Facilities.

The Arbitration Order requires that SBC provide CLECs with unbundled access to other network facilities – high capacity loops, dedicated transport, OCn and dark fiber loops, and dark fiber and feeder subloops – in circumstances where the FCC has said these facilities may not be required pursuant to § 251. As with unbundled switching discussed above, the MPSC ordered access to these facilities pursuant to § 271 of the Act. See Final Arbitrator's Report § I(A) at 1-3, 87-90; § III at 33, 47-48, 59; id. at 44 (loops); id. at 55 (dark fiber transport, dark fiber loops); id. at 68-69 (subloops).

SBC asserts that these aspects of the MPSC's Arbitration Order exceed the MPSC's jurisdiction and conflict with binding FCC rules for the reasons discussed above in connection with unbundled switching. The Court agrees. The MPSC lacks jurisdiction or authority to include § 271 checklist items or to order § 271 unbundling as part of arbitrated interconnection agreements, or to set rates for these items. In addition, the MPSC's decision to require unbundled access to these

facilities, in circumstances where the FCC has said they may not be unbundled under § 251, creates a substantive conflict with federal law and is accordingly preempted.

SBC's motion for summary judgment should also be granted on the issue of unbundled access to other network facilities no longer required under § 251, on the basis that the MPSC lacked jurisdiction to require the inclusion of these elements in SBC's interconnection agreements, and the Arbitration Order is contrary to federal law.

### D. Access to Entrance Facilities Under Section 251(c)(2).

SBC asserts that the Arbitration Order also contravenes the FCC's rulings in the TRRO by requiring SBC to provide CLECs with entrance facilities at TELRIC rates, although CLECs are no longer impaired with respect to entrance facilities and therefore are not entitled to these facilities as UNEs under § 251(c)(3). Defendant Sprint contends in its cross-motion for summary judgment that the MPSC correctly ruled that CLECs are entitled to entrance facilities as needed for interconnection pursuant to § 251(c)(2), and that TELRIC is the appropriate rate for these facilities. The Court agrees with Sprint's position.

An entrance facility is a transmission facility that connects CLEC networks with ILEC networks. See TRRO, 20 F.C.C.R. at 2609, ¶ 136. In the TRRO, the FCC held that CLECs are not impaired without access to entrance facilities, and therefore CLECs are not entitled to entrance facilities as unbundled network elements (UNEs) under § 251(c)(3). See 20 F.C.C.R. at 2609-12, ¶¶ 136-41. The TRRO is clear, however, that the FCC's "finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to § 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service." Id. at 2611, ¶ 140. "Thus, competitive LECs will have access to these facilities at

24

cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network." Id.

In the Arbitration Order, the MPSC acknowledged the FCC's ruling that CLECs are not entitled to entrance facilities as UNEs, but required SBC to allow access to these same facilities pursuant to 47 U.S.C. § 251(c)(2), which requires ILECs to provide "interconnection" to CLECs. See Final Arbitrator's Report, § IV at 16, 31-35; § V at 16. The Court concludes that the MPSC's Arbitration Order correctly implements the FCC's rulings on this issue as set forth in the TRRO and the TRO. See TRRO, 20 F.C.C.R. at 2611, ¶ 140; TRO, 18 F.C.C.R. at 17,202-04, ¶¶ 365-66.

In the context of ILEC-CLEC network arrangements, carriers can use entrance (transmission) facilities for at least two distinct purposes: (1) to provide a final link in the dedicated transmission path between a CLEC's customer and the CLEC's switch, and (2) as interconnection facilities to exchange traffic between ILEC and CLEC switches. In the first situation, a CLEC does not use entrance facilities for interconnection purposes, but rather to carry traffic to and from its own end users, a process known as "backhauling." In the second situation, a CLEC uses entrance facilities to interconnect with the ILEC's network, to provide a transmission path between the ILEC's switch and the CLEC's switch for the exchange of traffic between the two networks. See TRO, 18 F.C.C.R. at 17202-03, ¶¶ 365-66; see also Ex. 9 to Sprint's Mem. Supp. of Cross-Mot. for Summ. J. (schematic drawing).

The FCC determined that when a CLEC uses entrance facilities to carry traffic to and from its own end users (situation (1) above), the CLEC is not entitled to obtain entrance facilities from ILECs as § 251(c)(3) UNEs. See TRRO, 20 F.C.C.R. at 2610-12, ¶¶ 136-41. The FCC reaffirmed its earlier determination, however, that if a CLEC needs entrance facilities to interconnect with an ILEC's network (situation (2) above), the CLEC has the right to obtain such facilities from the ILEC, at cost-

based rates, under § 251(c)(2) of the Act.  Id. at 2611, ¶ 140; TRO, 18 F.C.C.R. at 17,202-04, ¶¶ 365-66.

The Court rejects SBC's contention that the TRRO only requires an ILEC to allow CLECs to interconnect with its network and does not require that it lease the interconnection facilities themselves to CLECs.  The FCC has interpreted "interconnection" to mean "the physical linking of two networks for the mutual exchange of traffic."  Local Competition Order, 11 F.C.C.R. at 15,590, ¶ 176.  In implementing this requirement, the FCC has held that CLECs have a "right . . . to obtain interconnection facilities pursuant to section 251(c)(2) . . . at cost-based rates . . . ."  TRRO, 20 F.C.C.R. at 2611, ¶ 140 (emphasis added).  The term "interconnect" refers to "'facilities and equipment,' not to the provision of any service."  AT & T Corp. v. FCC, 317 F.3d 227, 234-35 (D.C. Cir. 2003) (interpreting the term "interconnect" in § 251(a)(1)); see Competitive Telecommc'ns Ass'n v. FCC, 117 F.3d 1068, 1071 (8th Cir. 1997) (stating of § 251(c)(2), "By its own terms, this reference is to a physical link between the equipment of the carrier seeking interconnection and the LEC's network.").  Based on the foregoing, the Court concludes that SBC is required under the Act and FCC regulations to provide access to entrance facilities necessary for interconnection.

The MPSC made a factual determination that the SBC entrance (transmission) facilities provided under its agreement with Sprint would be used solely for interconnection purposes within the meaning of § 251(c)(2).  See Final Arbitrator's Report, § IV, at 33-35; id. § V, at 15-16.  This factual determination was supported by the record evidence.  See Direct Testimony of Don Price at 135-36 (Sprint Ex. 7); Rebuttal Testimony of Peter Sywenki at 8-11 (Sprint Ex. 4); Direct Testimony of Edward J. Cadieux at 73-75 (Sprint Ex. 5); Rebuttal Testimony of Edward J. Cadieux at 28-29 (Sprint Ex. 6).  Accordingly, the MPSC's factual determination is not arbitrary or capricious and should be affirmed.

The Arbitration Order requires SBC to allow access to entrance facilities at the same cost-based TELRIC rates that apply to UNEs, when the entrance facilities are used for interconnection purposes under § 251(c)(2). <u>See</u> Final Arbitrator's Report, § IV at 16, 31-35; § V at 16. Although SBC challenges use of the TELRIC rate, the Court concludes the Arbitration Order's requirement correctly implements the FCC's rulings.

The FCC stated in the TRRO that the Act mandates cost-based rates for network interconnection. <u>See</u> TRRO, 20 F.C.C.R. at 2611, ¶ 140. Section 251(c)(2)(D) requires ILECs to provide interconnection facilities on the "rates, terms and condition" that comply with the requirements of § 252. 47 U.S.C. § 251(c)(2)(D). Section 252(d)(1), in turn, provides that "the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251" shall be cost-based. <u>Id.</u>, § 252(d)(1)(A)(i). In implementing this rate provision, the FCC established the TELRIC methodology. <u>See</u> <u>Local Competition Order</u>, 11 F.C.C.R. at 15,844, ¶ 672; <u>see</u> <u>also</u> 47 C.F.R. §§ 51.501(a)-.505 (2005) (applying TELRIC to the pricing of interconnection). The FCC concluded that Congress intended to apply the same pricing rules to interconnection and UNEs, based on the plain language of §§ 251(c)(2), (c)(3), and § 252(d)(1). <u>See</u> <u>Local Competition Order</u>, 11 F.C.C.R. at 15, 816, ¶ 628. The Arbitration Order correctly adhered to the FCC's mandate when it directed the use of TELRIC rates for entrance facilities provided by SBC under the Sprint Agreement for use as interconnection facilities.

For these reasons, the Arbitration Order should be affirmed to the extent it determined that CLECs are entitled to entrance facilities as needed for interconnection pursuant to § 251(c)(2), and that TELRIC is the appropriate rate for these facilities. SBC's motion for summary judgment should therefore be denied with respect to the entrance facilities issue and Sprint's cross-motion for summary judgment should be granted.

### E.  Compensation for IP-PSTN Traffic.

The final issue in SBC's motion for summary judgment challenges the MPSC's determination that SBC and the CLECs should exchange reciprocal compensation for Internet Protocol ("IP") to public switched telephone network ("PSTN") traffic, instead of higher switched access charges for this traffic.  SBC contends that reciprocal compensation for IP-PSTN traffic is contrary to the Act and the FCC's rules.  SBC also contends that this aspect of the Arbitration Order is arbitrary and capricious and results from a failure to engage in reasoned decision-making.[14]

The defendants respond that the MPSC's determination is consistent with the Act and the FCC's current intercarrier compensation rules, and should be affirmed.  The defendants assert that all IP-PSTN traffic is eligible for reciprocal compensation under the Act, and is exempt from access charges under longstanding FCC precedent which insulates providers of "enhanced services" from the access charges that would apply to carriers providing basic long distance service.  The Court agrees with the defendants.

### Background.

#### 1.  Reciprocal Compensation.

Section 251(b)(5) of the Act imposes upon LECs the "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5); Ace Tel. Ass'n v. Koppendrayer, 432 F.3d 876, 881 (8th Cir. 2005).  "Reciprocal compensation is payment from the carrier who originates a call to the carrier who terminates or

---

[14]In the proceedings before the MPSC, SBC argued that access charges should apply to all IP to PSTN traffic.  In the case before the Court, SBC limits its argument, asserting that access charges should apply only to "interexchange" IP to PSTN traffic.  This difference is immaterial, because the Court concludes that all IP-PSTN traffic is eligible for reciprocal compensation under the Act.

receives a call. Reciprocal compensation is intended to permit the carrier for the customer who receives a call to recoup from the caller's carrier those expenses incurred for terminating the call or sending it to its final destination." WWC License, L.L.C. v. Boyle, No. 05-1725, 2006 WL 2419162, *2 , __ F.3d __ (8th Cir. Aug. 23, 2006) (citing Ace Tel., 432 F.3d at 878, and 47 U.S.C. § 252(d)(2)(A)(i) (stating that reciprocal compensation must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier.")).

The FCC's definition of the scope of reciprocal compensation has changed over time. In 1996, the FCC initially limited the application of reciprocal compensation to the exchange of "local" traffic, Local Competition Order, ¶¶ 1033-1034, 1040, and defined "local" traffic for reciprocal compensation purposes as traffic that "originates and terminates" in the same local calling area. 47 C.F.R. § 51.701(b)(1) (1996), vacated, Bell Atlantic Tel. Cos. v. FCC, 206 F.3d 1 (D.C. Cir. 2000).

In 2001, the FCC examined whether reciprocal compensation should apply to traffic directed to Internet Service Providers ("ISP traffic"). In connection with that particular inquiry, it abandoned the prior focus on whether traffic was "local." In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic, 16 F.C.C.R. 9151, ¶¶ 8, 30, 36 n.64, 39, 42 (2001) ("ISP Remand Order"). Instead, the FCC determined that reciprocal compensation should apply to all traffic that is not encompassed by § 251(g) of the Act, which preserved pre-Act rules for "exchange access, information access, and exchange services for such access." 47 U.S.C. § 251(g).

The ISP Remand Order was appealed to the D.C. Circuit, which reversed the FCC's interpretation of § 251(g). WorldCom, Inc. v. FCC, 288 F.3d 429, 433-34 (D.C. Cir. 2002). The Court concluded that "[o]n its face, § 251(g) appears to provide simply for the 'continued

enforcement' of certain pre-Act regulatory 'interconnection restrictions and obligations.'" Id. at 432.

The Court stated that while § 251(g) preserves pre-Act obligations under a "regulation, order, or policy of the Commission," it does not authorize the FCC to "override virtually any provision of the 1996 Act so long as the rule it adopted were in some way, however remote, linked to LECs' pre-Act obligations." Id. at 433. Section 251(g) did not empower the FCC to exempt ISP-bound traffic from reciprocal compensation because "there had been no pre-Act obligation relating to intercarrier compensation for ISP-bound traffic." Id. Although the D.C. Circuit found no basis for the FCC's action, it chose not to "make . . further determinations" regarding the validity of the ISP Remand Order and left the Order in place and remanded it to the FCC for further proceedings consistent with the Court's decision. Id. at 434. To date, the FCC has not yet issued another comprehensive order governing intercarrier compensation for ISP traffic.

## 2. Access Charges.

Access charges are part of an intercarrier compensation regime established in the 1980s to govern long distance calls. See Iowa Network Servs. Inc., 363 F.3d at 686; Bell Atlantic Tel. Cos., 206 F.3d at 7-8. "Exchange access" means "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(16). "Telephone toll service" is defined as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." Id. § 153(48). Access charges historically have included "significant implicit subsidies" and by definition have been well above cost. See In re Access Charge Reform, 12 F.C.C.R. 15,982, ¶¶ 39-40 (1997) ("Access Charge Reform Order"); Competitive Telecommc'ns Ass'n v. FCC, 309 F.3d 8, 14-15 (D.C. Cir. 2002) (describing "implicit subsidies" for universal

service that remain "embedded in access charges.").  As a result, an incumbent carrier that collects access charges for terminating traffic receives more money than it would if it exchanged reciprocal compensation for the same traffic.

### 3. Enhanced Services and Information Services.

In 1980, the FCC distinguished between "basic service," i.e., regular telephone service, and "enhanced service," i.e., computer-processing service offered over telephone lines.  See National Cable & Telecommc'ns Ass'n v. Brand X Internet Servs., 545 U.S. 967, 125 S. Ct. 2688, 2696 (2005).  A basic service was a "transparent transmission . . . that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information . . . ."  Id. at 2697; see also In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 77 F.C.C.R. 384, ¶¶ 94-96 (1980) ("Computer II Order").  In contrast, an "enhanced service" was defined as "service in which computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber's information, such as voice and data storage services, as well as protocol conversion (i.e., ability to communicate between networks that employ different data transmission formats)."  Brand X Internet Servs., 125 S. Ct. at 2697 (alteration in original; internal citation omitted); see also Computer II Order, ¶¶ 97, 99.

Prior to the Act, telecommunications traffic was regulated based on the distinction between "basic" and "enhanced" services.  Basic services were heavily regulated, Brand X Internet Servs., 125 S. Ct. at 2697, and could be subject to compensation rules such as the access charge regime.  Enhanced services generally were outside the scope of common-carrier regulation.  Id.  "The

Commission explained that it was unwise to subject enhanced service to common-carrier regulation given the fast-moving, competitive market in which they were offered." Id.

In 1988, the FCC excluded providers of enhanced services from the obligation to pay access charges imposed on interexchange carriers exchanging long distance traffic. In re Amendments of Part 69 of the Commission's Rules Relating to Enhanced Service Providers, 3 F.C.C.R. 2631, ¶ 17 (1988) ("ESP Exemption Order"). The FCC did not directly exempt enhanced service providers ("ESPs") from interstate access charges, but rather defined ESPs as "end users." See ACS of Anchorage, Inc. v. FCC, 290 F.3d 403, 409 (D.C. Cir. 2002). As end users, ESPs obtain access to other carriers' networks by purchasing a local business line (and paying tariffed rates for use of those lines). Id. at 409. The FCC recognized that ISP-bound traffic was interstate access, but treated such traffic as though it were local. BellSouth Telecommc'ns, Inc. v. ITC Deltacom Commc'ns, Inc., 62 F.Supp.2d 1302, 1313 (M.D. Ala. 1999). Although the exemption for ESPs was described as a temporary means to avoid "unduly" burdening the developing IP industry, ESP Exemption Order, ¶ 2, it remains in effect. See In re Developing a Unified Intercarrier Compensation Regime, 20 F.C.C.R. 4685, ¶ 1 n.2 (2005) (noting continued existence of ESP exemption); In re Amendments of Part 6 of the Commission's Rules Relating to the Creation of Access Charge Supplements for Open Network Architecture Policy and Rules Concerning Rates for Dominant Carriers, 6 F.C.C.R. 4524, ¶ 60 (1991) (retaining exemption for policy reasons); BellSouth Telecommc'ns, Inc., 62 F.Supp.2d at 1313 (noting FCC's continued maintenance of ESP exemption).

The Act defines two classes of telecommunications traffic – "information service" and "telecommunications service" – which are analogous to the pre-Act distinction between enhanced and basic services. 47 U.S.C. §§ 153(20), 153(46); see Brand X Internet Servs., 125 S. Ct. at 2697. A

"telecommunications service" is "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." 47 U.S.C. § 153(46). The Act defines an "information service" as the offering of a capability "for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information *via telecommunications*." Id., § 153(20) (emphasis added). "Telecommunications" is defined as the "*transmission*, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Id., § 153(43) (emphasis added).

### 4. VoIP Telecommunications.

Voice Over Internet Protocol ("VoIP") technologies enable real-time delivery of voice and voice-based applications. Petition for Declaratory Ruling that AT & T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges, 2004 WL 856557, 19 F.C.C.R. 7457, at ¶ 3 (Order April 21, 2004) ("AT & T Access Charge Order"). "When VoIP is used, a communication traverses at least a portion of its path in an IP packet format using IP technology and IP networks." Southwestern Bell Tel., L.P. v. VarTec Telecom, Inc., 2005 WL 2033416, *2 (E.D. Mo. Aug. 23, 2005) (citing AT & T Access Charge Order). "VoIP can be transmitted over the public Internet or over private IP networks, using a variety of media." Id.

VoIP "had not emerged from the labs in any meaningful way" at the time the Act was enacted. Remarks of Michael K. Powell, then-Chairman, Federal Communications Commission, at 1, Oct. 19, 2004 (Ex. B. to MCI Communications Services, Inc.'s Mem. in Opp. to SBC Mot. for Summ. J.). The FCC has not yet issued regulations exclusively addressing the classification and treatment of VoIP traffic, although there are ongoing FCC proceedings concerning VoIP. See In the Matter of IP-Enabled Services, WC Docket No. 04-36, Notice of Proposed Rulemaking, FCC No. 04-28, 19

F.C.C.R. 4863 (F.C.C. Mar. 10, 2004) ("IP Rulemaking Notice").  Among the issues on which the FCC is seeking comment are (1) "the extent to which access charges should apply to VoIP and other IP-enabled services," and (2) how to classify the providers of these services.  Id. at ¶ 61.  See generally VarTec Telecom, Inc., 2005 WL 2033416, at *4 (noting lack of FCC rules concerning VoIP service).  Nonetheless, "[i]t is obvious from continuing debates over the proper classification of broadband and VoIP services that the purported 'bright line' between basic and enhanced services . . . increasingly is becoming blurred and subject to confusion." Frontier Tel. of Rochester, Inc. v. USA Datanet Corp., 386 F.Supp.2d 144, 150 (W.D.N.Y. 2005) (quoting Richard S. Whitt, A Horizontal Leap Forward: Formulating a New Communications Public Policy Framework Based on the Network Layers Model, 56 Fed. Comm. L.J. 587, 652 (May 2004); (alteration in original).

Although the FCC has not yet issued regulations addressing VoIP, existing rules and orders establish how VoIP and other IP services should be treated in the interim.  In a 1998 report to Congress, In re Federal-State Joint Board on Universal Service, Report to Congress, 13 F.C.C.R. 11,501 (1998) ("Universal Service Report"), the FCC first articulated standards to aid the communications industry in applying its existing definitions to various configurations of VoIP technologies.  The FCC concluded that "computer-to-computer" IP telephony, in which phone service is provided over broadband facilities using non-traditional customer premises equipment such as a computer, would likely would be an "information service." Universal Service Report, ¶ 87.  The FCC also discussed "phone-to-phone" IP telephony, which does not require customers to use equipment different from that used to place an ordinary touch-tone call, and "transmits customer information without a net change in form or content." Id., ¶ 88.  The record suggested that phone-to-phone IP telephony was not an information service, and might be subject to access charges. Id., ¶ 91.

The FCC has issued two recent orders addressing specific VoIP services and a third order addressing it in the context of another statute. In the first order, the FCC concluded that "computer-to-computer" VoIP offered by Pulver.com constituted an "information service" because Pulver.com offered its customers the capability of "generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information." In re Petition for Declaratory Ruling that Pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service, 19 F.C.C.R. 3307, ¶¶ 4, 12, 26 (2004) ("Pulver Order").

In the second order, the FCC addressed a petition by AT & T regarding the regulatory classification of its "phone-to-phone" IP telephony service, which uses IP inside the long distance carrier's network to more efficiently provide transmission for voice calls that both originate and terminate as regular phone calls over the traditional telephone network. The FCC reasoned that the AT & T offering is a "telecommunications service" under the Act because, inter alia, it involves no "net protocol conversion" and uses "ordinary customer premises equipment (CPE) with no enhanced functionality." AT & T Access Charge Order, ¶ 1. The FCC emphasized that this rule applied only to AT & T's specific services and VoIP services that shared all of the characteristics which supported its determination that AT & T's service was a telecommunications service.[15] Id., ¶¶ 1, 11, 13, 15.

_____

[15]The FCC described AT & T's VoIP service under consideration as: "an interexchange service that: (1) uses ordinary customer premises equipment with no enhanced functionality; (2) originates and terminates on the public switched telephone network (PSTN); and (3) undergoes no net protocol conversion and provides no enhanced functionality to end users due to the provider's use of IP technology." AT & T Access Charge Order, ¶ 1. "No net protocol conversion occurs [during this particular type of VoIP service] because the telephone transmissions begin and end as ordinary telephone calls." Southwestern Bell Tel., L.P. v. VarTec Telecom, Inc., 2005 WL 2033416, at *2, n.7 (E.D. Mo. Aug. 23, 2005).

"To avoid placing AT&T at a competitive disadvantage, the FCC ruled that all interexchange carriers providing IP telephony are required to pay access charges for calls that 'begin on the PSTN, undergo no net protocol conversion, and terminate on the PSTN.' [AT & T Access Charge Order]

In the third order, the FCC addressed the petitions of several law enforcement agencies to clarify the scope of the Communications Assistance for Law Enforcement Act ("CALEA")[16] with respect to whether providers of broadband Internet access and VoIP services are regulable as "telecommunications carriers" under CALEA. In re Matter of Communications Assistance for Law Enforcement Act and Broadband Access and Services, 2005 WL 2347765, 20 F.C.C.R. 14,989, ¶¶ 15-16 (2005) ("CALEA Order"). Although the CALEA Order interprets a different statute, it is useful because the FCC examined the nature of VoIP services, offered its interpretation of aspects of the Act, and discussed significant differences between the statutory language of CALEA and that of the Act.

As relevant here, the FCC stated that the Act's definitions of "telecommunications service" and "information service" are mutually exclusive categories. CALEA Order, ¶¶ 15, 16. The Act's definition of "telecommunications" is "narrow" and only includes transmissions that do not alter the form or content of the information as sent and received. Id.; see 47 U.S.C. § 153(43). The FCC described VoIP as a hybrid service that contains both "telecommunications" and "information" components. CALEA Order, ¶¶ 39-45; American Council on Educ. v. FCC, 451 F.3d 226, 229 (D.C. Cir. 2006). The FCC stated that the Act requires it to "classify an integrated service offering as solely a telecommunications service or solely an information service depending on 'the nature of the functions that the end user is offered'." CALEA Order, ¶ 16. The FCC ruled that the telecommunications component of an integrated information service offering falls exclusively within the Act's information service category:

at ¶ 18. This rule applies whether the interexchange carrier provides its own IP voice services or contracts with another provider to do so. Id." VarTec Telecom, Inc., 2005 WL 2033416, at * 2.

[16]47 U.S.C. §§ 1001-1010.

a single entity offering an integrated service combining basic telecommunications transmission with certain enhancements, specifically "capabilities for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information," offers only an information service, and not a telecommunications service, for purposes of the [Telecommunications] Act if the telecommunications and information services are sufficiently intertwined.

CALEA Order, ¶ 15; see id., ¶ 17.

These orders offer some guidance but also leave unanswered questions concerning the proper regulatory framework for services and applications that use the Internet to deliver voice and voice-based applications, including IP-PSTN. A key question is the application of the FCC's definitions of "information services" or "enhanced services" to these IP-based technologies. IP Rulemaking Notice, ¶¶ 35-36.

### 5. The MPSC's Ruling on IP-PSTN Traffic.

The Final Arbitrator's Report contained two separate, conflicting rulings concerning IP-PSTN traffic. The first ruling resolved MCI's issue concerning the terms and condition applicable to intrastate interexchange switched access traffic. The Arbitrator ruled in favor of MCI that IP-PSTN traffic should be charged at reciprocal compensation rates instead of switched access rates, because IP-PSTN traffic is an "enhanced service" that "falls squarely within the 'net-protocol change' portion of the FCC's multi-part enhanced service definition." Final Arbitrator's Report at 21-22.

The second ruling addressed both PSTN-IP-PSTN and IP-PSTN, and resolved numerous issues presented by SBC, AT & T and several CLECs. The CLEC Coalition argued that the MPSC should refrain from incorporating any provisions concerning IP-PSTN and VoIP in the interconnection agreements until the FCC issued governing regulations. The Arbitrator proceeded to address the issues and after a lengthy recitation of the parties' positions ruled in favor of SBC that

interexchange switched access traffic, including interexchange IP-PSTN traffic, is subject to switched access charges "for the reasons offered by SBC." Final Arbitrator's Report at 34-50.

The CLEC Coalition filed comments on the Final Arbitrator's Report, requesting clarification of the inconsistent rulings concerning IP-PSTN. In its comments on the Final Arbitrator's Report, SBC argued that it was arbitrary for the MPSC to adopt MCI's IP-PSTN proposal while excluding other carriers' IP-PSTN traffic from reciprocal compensation. In the Arbitration Order, the MPSC resolved the conflict by concluding that IP-PSTN traffic is subject to reciprocal compensation rather than access charges.

## Discussion.

The Court concludes that the MPSC's decision subjecting IP-PSTN traffic to reciprocal compensation is consistent with the Act and the FCC's rules, and is not arbitrary or capricious. The decision is consistent with the FCC's orders because (1) federal law does not exempt IP-PSTN traffic from reciprocal compensation obligations, and (2) federal access charges are inapplicable to IP-PSTN traffic because such traffic is an "information service" or an "enhanced service" to which access charges do not apply.

### 1. Reciprocal Compensation.

The Act requires carriers to exchange reciprocal compensation for all "telecommunications," 47 U.S.C. § 251(b)(5), unless that particular form of telecommunications was regulated under a pre-Act compensation regime expressly preserved by § 251(g) of the Act. Id., § 251(g). Read together, these sections establish that carriers must exchange reciprocal compensation to transport and terminate telecommunications unless a separate pre-Act rule prescribed a different form of compensation for that form of communications. See WorldCom, Inc., 288 F.3d at 433.

The reciprocal compensation obligation applies to IP-PSTN traffic because when a CLEC acts as a VoIP provider it uses "telecommunications" to transmit IP-PSTN traffic to the network of the carrier that provides service to the called party. The Act defines "telecommunications" as the "*transmission*, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43) (emphasis added). After the CLEC has converted a call that originates in IP format to Time Division Multiplex ("TDM") format,[17] it transmits voice communications from its network to the network of the called party's telecommunications provider. See IP-PSTN Service Diagram (Ex. D to MCI's Mem. Opp. to SBC's Mot. for Summ. J.). From that point forward, the communication is sent and received in TDM format, and involves no further change in form or content.

Because IP-PSTN is a new service developed after the Act, there is no pre-Act compensation regime which could have governed it, and therefore § 251(g) is inapplicable. Cf. WorldCom, Inc., 288 F.3d at 433-34 (Section 251(g) could not apply to ISP-bound traffic because there was no pre-Act regime specially governing compensation for that service). As a result, IP-PSTN traffic falls within the statutory mandate that reciprocal compensation be used to compensate carriers for transporting traffic between calling and called parties that subscribe to different carriers.

---

[17]"Time Division Multiplexing, or 'TDM,' occurs when calls are digitized and broken up into segments. These segments are sent in order, with segments from other telephone calls placed in between, then reassembled at the other end." SightSound.com, Inc. v. N2K, Inc., 185 F.Supp.2d 445, 459 (W.D. Pa. 2002).

A significant change in format – net-protocol conversion – occurs at an earlier stage of IP-PSTN communications. See MCI Ex. D. As will be discussed infra, that net-protocol conversion makes IP-PSTN an information service eligible for a special exemption to the payment of access charges.

SBC argues that 47 C.F.R. § 51.701(b)(1) exempts three categories of traffic from reciprocal compensation and that "interexchange IP-PSTN" falls within the exemption because it is a non-local "interexchange" call. SBC Mem. at 25-26, 28. Although the FCC's ISP Remand Order initially interpreted § 251(g) as excluding the three categories of traffic from federal reciprocal compensation requirements, the D.C. Circuit reversed that interpretation, explaining that § 251(g) preserves only pre-Act compensation rules for those services. WorldCom, Inc., 288 F.3d at 432-33; see also Atlas Tel. Co. v. Oklahoma Comm'n, 400 F.3d 1256, 1262-63 (10th Cir. 2005) (explaining operation of § 251(g)). Following the D.C. Circuit's ruling, the FCC abandoned its prior view and subsequently "disagreed with [the] assertion that every form of traffic listed in section 251(g) should be excluded from section 251(b)(5) reciprocal compensation."[18] In re Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes With Verizon Virginia Inc, and for Expedited Arbitration, 17 F.C.C.R. 27,039, ¶ 261 (2002).

SBC's assertion that reciprocal compensation can only apply to "local" traffic, SBC Mem. at 26, is not supported by current law. As discussed above, the FCC's 1996 Local Competition Order focused on calls' jurisdictional status as "local." In 2001, however, the FCC relinquished its prior reliance on a call's jurisdictional status as "local" or "long distance" as a basis for determining its eligibility for reciprocal compensation. ISP Remand Order, ¶¶ 34-35; Southern New England Tel.

---

[18]Neither § 251(g) nor the corresponding FCC regulation identifies "interexchange traffic" as a category of traffic for which pre-existing rules are preserved. Instead, the three categories are exchange access, information access, and services for the provision of exchange or information access. SBC does not argue in its Memorandum that IP-PSTN traffic is exchange access or information access. Even if SBC's interpretation of § 251(g) were correct, it would not support SBC's contention that all traffic between end users in different exchanges is by definition excluded from reciprocal compensation.

Co. v. MCI WorldCom Commc'ns, Inc., 353 F.Supp.2d 287, 298 (D. Conn. 2005). Thus, IP-PSTN traffic's status as a "local" call does not control whether it is subject to reciprocal compensation.

## 2. Access Charges.

SBC also argues that interexchange IP-PSTN traffic is subject to access charges and therefore is outside the reciprocal compensation regime. SBC Mem. at 28. This argument fails because federal access charges are inapplicable to an "information service" or "enhanced service." AT & T Access Charge Order, ¶ 4; see also Brand X Internet Servs., 125 S. Ct. at 2696. Although the FCC has not yet ruled whether IP-PSTN is such a service, the orders it has issued lead to the conclusion that IP-PSTN is an "information service."[19]

As discussed supra, the FCC's "ESP exemption" excuses providers of "enhanced services" from paying access charges. See ESP Exemption Order, ¶ 2; see also Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas, 208 F.3d 475, 487 n.19 (5th Cir. 2000) (acknowledging ESP exemption). The ESP Exemption Order classifies enhanced service providers ("ESPs") as end users of telecommunications service. ACS of Anchorage, Inc., 290 F.3d at 409. Because only "carriers" are subject to access charges, being an "end user" means that ESPs do not pay those charges. ESPs' status as end users places them outside the access charge regime "even for calls that appear to traverse state boundaries." See Access Charge Reform Order, ¶ 342. Although the ESP exemption

---

[19]It is important to note that IP-PSTN traffic's status as an "information service," and not a "telecommunications service," does not take it beyond the scope of the "telecommunications" to which reciprocal compensation applies. By definition, information services are provided "*via telecommunications*." 47 U.S.C. § 153(20) (emphasis added). Further, as previously discussed, CLECs provide telecommunications as part of their VoIP offerings because they transmit the communications to the LEC's network after the net-protocol conversion has occurred. The telecommunications feature does not subject the traffic to access charges because, as will be discussed, FCC rules exempt carriers from paying access charges when they offer information services.

was enacted as an interim measure, it remains in effect. See ITC Deltacom Commc'ns, Inc., 62 F.Supp.2d at 1313. Consequently, if IP-PSTN traffic is an enhanced or information service, then the MPSC correctly ruled that CLECs should not pay access charges when they originate or terminate IP-PSTN traffic.

Now known as "information services," Brand X Internet Services, 125 S. Ct. at 2706, "enhanced services" are "services in which computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber's information, such as voice and data storage services, as well as protocol conversion (*i.e.*, ability to communicate between networks that employ different data-transmission formats)." Id. at 2697 (alteration in original; internal citations omitted); see also 47 C.F.R. § 64.702(a); IP Rulemaking Notice, ¶ 27 n.94. The Act defines an "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20).

Net-protocol conversion is a determinative indicator of whether a service is an enhanced or information service. See In re Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 11 F.C.C.R. 21,905, ¶ 104 (1996). A net-protocol conversion occurs when "an end-user [can] send information into a network in one protocol and have it exit the network in a different protocol." Id. That conversion "transforms" information, and therefore provides an "enhanced" and an "information" service. Id., ¶¶ 105–06.

IP-PSTN traffic is an information service within the meaning of the Act because it offers the "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making

available information via telecommunications."[20] 47 U.S.C. § 153(20); see Universal Service Report, ¶ 39. IP-PSTN also alters the form and content of the information sent and received, see Brand X Internet Services, 125 S. Ct. at 2697; 47 U.S.C. § 153(43), because it involves a net protocol conversion from the digitized packets of the IP protocol to the TDM technology used on the PSTN. Vonage, 290 F.Supp.2d at 1000; see Price Test. at 118. The communication originates at the caller's location in IP protocol, undergoes a net change in form and content when it is transformed at the CLEC's switch into the TDM format recognized by conventional PSTN telephones, and ends at the recipient's location in TDM. Vonage, 290 F.Supp.2d at 1000; see Ex. D to MCI's Mem. Opp. to SBC's Mot. Summ. J. Without this protocol conversion from IP to TDM, the called party's traditional telephone could not receive the VoIP call.[21] See IP Rulemaking Notice, ¶ 8 (noting that IP transmits data "in a manner fundamentally different than the way in which signals transit a circuit-switched service" on the PSTN). For these reasons, IP-PSTN is an information service. See Vonage, 290 F.Supp.2d at 1000 (holding that computer-to-phone VoIP is an "information service" rather than a "telecommunications service" under the Act).

The conclusion that IP-PSTN is an information service is supported by the FCC's orders addressing related issues. The FCC determined that AT & T's PSTN-IP-PSTN traffic is a telecommunications service because no net protocol conversion occurs, as the traffic begins and ends on the conventional telephone network. AT & T Access Charge Order. In contrast, IP-PSTN service

---

[20]"[T]he FCC recognized that the architecture of information services would be built on top of existing telecommunications services infrastructure, but, in terms of regulation, would still remain separate for strong policy purposes." Vonage Holdings Corp. v. Minnesota Pub. Util. Comm'n, 290 F.Supp.2d 993, 1001 (D. Minn. 2003).

[21]It does not matter that there is a "voice" at both ends of an IP-PSTN call. The same is true of voicemail, which the FCC has long recognized is an information service. See In re Schools and Libraries Universal Service Support Mechanism, 18 F.C.C.R. 9202, ¶ 29 n.49 (2003).

involves a net protocol conversion from IP format to TDM format. The FCC determined that a "computer-to-computer" VoIP service constituted an "information service" because it offered customers the capability of "generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information." Pulver Order. IP-PSTN is computer-to-phone VoIP, but also offers customers the capability of "generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information." As such, IP-PSTN also constitutes an information service. Finally, the FCC described VoIP as a hybrid service which has both telecommunications and information components and stated that under the Act, such an offering combining basic telecommunications with "capabilities for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information" falls exclusively within the information service category if the telecommunications and information services are sufficiently intertwined. CALEA Order, ¶ 15. IP-PSTN has both information and telecommunications components, which are intertwined to permit telephone communication between computer users and PSTN users.

For these reasons, the Court concludes that the Arbitration Order's decision subjecting IP-PSTN traffic to reciprocal compensation rather than access charges is consistent with federal law and should be affirmed.

### 3. Adequacy of Decision Making.

SBC also contends that the MPSC's final decision on the IP-PSTN issue was arbitrary and capricious and resulted from a failure to engage in reasoned decision making. SBC contends that the MPSC resolved the Arbitrator's conflicting rulings regarding IP-PSTN traffic on the sole basis that the traffic "should be treated consistently" and without any explanation why the MPSC thought one

approach was preferable to the other.  SBC Mem. at 29 (citing Arbitration Order at 36); SBC Reply at 14.

The Court disagrees with SBC.  The MPSC did more than simply state that the two rulings concerning IP-PSTN should be consistent.  It articulated the carriers' competing positions and the basis for the Arbitrator's initial adoption of SBC's proposal that IP-PSTN should be subject to access charges.  Arbitration Order at 35.  It discussed the Coalition's arguments that (1) the AT & T Access Charge Order relied on by the Arbitrator holds only that access charges should apply to PSTN-IP-PSTN traffic, and (2) IP-PSTN traffic is qualitatively different from PSTN-IP-PSTN because it is an enhanced service involving a net-protocol change and therefore should be charged at reciprocal compensation rates.  Arbitration Order at 34-35.  The MPSC then explained that the Arbitrator had adopted MCI's proposal because "IP-PSTN traffic . . . falls squarely within the 'net-protocol change' portion of the FCC's multi-part enhanced service definition and is therefore appropriately charged at reciprocal compensation rates instead of switched access rates."  Id. at 36.  The MPSC further stated that all IP-PSTN traffic should be treated similarly, and modified the Final Arbitrator's Report to provide that the Coalition CLECs' interconnection agreements should provide that IP-PSTN traffic would be subject to reciprocal compensation rather than access charges.  Id. at 36.

The MPSC's discussion of the conflicting rulings indicates its recognition that IP-PSTN traffic is an information service and is qualitatively different than PSTN-IP-PSTN traffic, which is a telecommunications service.  This fulfilled the MPSC's obligation to base its decision on "a consideration of the relevant factors."  National Wildlife Fed'n v. Whistler, 27 F.3d 1341, 1344 (8th Cir. 1994); see also Southern New England Tel. Co. v. Connecticut, Dep't of Public Util. Co., 285 F.Supp.2d 252, 258 (D. Conn. 2003) ("A reviewing court may uphold an agency decision of 'less

than ideal clarity if the agency's path may reasonably be discerned."). By modifying the Arbitrator's ruling to apply reciprocal compensation to IP-PSTN traffic under the interconnection agreements, the MPSC indicated that it found the rationale for adopting MCI's proposal more persuasive than SBC's position. The MPSC's decision was therefore not arbitrary or capricious.

**Conclusion**.

For the foregoing reasons, the Court concludes that the Arbitration Order neither violates federal law nor constitutes an arbitrary and capricious determination of the facts with respect to the issue of reciprocal compensation for IP-PSTN traffic. Accordingly, the Arbitration Order should be affirmed and SBC's motion for summary judgment should be denied on this issue.

**IV**.

**Charter Fiberlink-Missouri, LLC's Motion for Summary Judgment**.

Defendant Charter Fiberlink-Missouri, LLC ("Charter") moves for summary judgment on its Counterclaim/Cross-claim ("cross-claim"). Charter's cross-claim challenges the MPSC's determination that exchange access charges, rather than the lower reciprocal compensation charges, apply to regular telephone calls that travel outside the local calling areas established by the state commission, even if the calls do not travel outside the originating carrier's local calling area for billing purposes. Charter would like to compete against SBC in the retail market by offering its customers a larger local calling area than SBC does, but under the Arbitration Order, Charter would be required to pay access charges to SBC for certain calls that travel outside SBC's local calling area even though the calls would not travel outside Charter's local calling area and Charter would not collect a toll from its customers on the calls.

SBC and the MPSC oppose Charter's motion for summary judgment. For the following reasons, Charter's motion should be denied.

**Background**.

As previously discussed, the Act imposes a duty on all telecommunications carriers to interconnect their networks either directly or indirectly with the facilities and equipment of other telecommunications carriers. 47 U.S.C. § 251(a). The Act also imposes a duty on local exchange carriers (LECs) "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." Id., § 251(b)(5). "Reciprocal compensation is payment from the carrier who originates a call to the carrier who terminates or receives a call. Reciprocal compensation is intended to permit the carrier for the customer who receives a call to recoup from the caller's carrier those expenses incurred for terminating the call or sending it to its final destination." WWC License, L.L.C., No. 05-1725, 2006 WL 2419162, *2 (citations omitted); 47 U.S.C. § 251(b)(5).

To facilitate compliance with the congressional mandate requiring interconnection and reciprocal compensation, the FCC issued rules requiring "reciprocal compensation for transport and termination of telecommunications traffic between LECs and other telecommunications carriers." 47 C.F.R. § 51.701(a). The obligation to pay reciprocal compensation applies to all telecommunications traffic except for "interstate or intrastate exchange access, information access, or exchange services for such access." 47 C.F.R. § 51.701(b)(1). All of these items are "access services" which "connect calls that travel to points – both interstate and intrastate – beyond the local exchange." ISP Remand Order, 16 F.C.C.R. 9168, ¶ 37. At issue on this motion are interstate and intrastate exchange service, commonly referred to as long-distance or toll calls. These calls are subject to "access charges," which are significantly higher than reciprocal compensation charges.

Under the access charge scheme, an inter-exchange or intra-exchange carrier pays the LEC for its use of the LEC's local network facilities. See, e.g., 47 C.F.R. § 69.124.[22]

**Proceedings Before the MPSC**.

As part of the arbitration proceedings before the MPSC, Charter and SBC submitted an issue concerning the definition of mandatory local calling areas. For purposes of their interconnection agreement, Charter and SBC disagreed as to whether the local calling areas defined in SBC's MPSC-approved local exchange tariffs should control whether reciprocal compensation or access charges are appropriate for completing particular calls.

Charter proposed that the distinction between toll and local traffic for purposes of intercarrier compensation would be defined by the local calling area of the company that originates the call. Charter's proposed contract language provided in relevant part:

> For purposes of this Agreement only, Switched Access Traffic shall mean all traffic that originates from an end user physically located in one local exchange and delivered for termination to an end user physically located in a different local exchange (excluding traffic from exchanges sharing a common mandatory local calling area as defined in <u>the originating party's</u> local exchange tariffs on file with the applicable state commission). (Emphasis added).

In contrast, SBC proposed that the distinction between toll and local traffic for purposes of intercarrier compensation would be defined by SBC's mandatory local calling area in its local exchange tariffs filed with the MPSC. SBC's proposed contract language provided in relevant part:

> For purposes of this Agreement only, Switched Access Traffic shall mean all traffic that originates from an end user physically located in one local exchange and delivered for termination to an end user physically located in a different local exchange (excluding traffic from exchanges sharing a common mandatory local calling

---

[22]"Information access" generally refers to calls from ILEC subscribers to dial-up Internet Service Providers served by a CLEC. This type of access is not at issue in Charter's motion for summary judgment.

area as defined in <u>SBC 13-STATES's</u> local exchange tariffs on file with the applicable state commission).  (Emphasis added).

After discussing each party's position, the Arbitrator adopted SBC's proposed language and stated that Charter's proposed language was "in conflict with applicable law and would be unworkable in practice."  <u>See</u> Final Arbitrator's Report, § VI at 15-21.  Charter challenged the arbitrator's decision on this issue, but the Arbitration Order did not modify the Final Arbitrator's Report and therefore the MPSC adopted the Final Arbitrator's Report as its decision on the issue. <u>See</u> Arbitration Order at 9.

### **Discussion**.

Charter argues that this aspect of the Arbitration Order is plain error under controlling federal law and must be reversed.  Charter contends that the Arbitration Order violates 47 C.F.R. § 51.701(b)(1), which defines telecommunications traffic for purposes of reciprocal compensation as "telecommunications traffic exchanged between a LEC and a telecommunications carrier . . ., except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access."  47 C.F.R. § 51.701(b)(1).  Charter states that reciprocal compensation is the "default case," <u>i.e.</u>, that any type of traffic exchanged between two LECs should be subject to reciprocal compensation unless it is (1) interstate or intrastate exchange access, or (2) information access or exchange services for information access.

Charter states that the Act defines "exchange access" as referring only to the use of LEC services or facilities for the purpose of originating or terminating "telephone toll service," 47 U.S.C. § 153(16), which in turn is defined as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service."  <u>See</u> 47 U.S.C. § 153(48).  Charter contends that except in situations where it is asking SBC

to terminate an actual toll call – i.e., a call for which Charter has charged its own customer a toll and then hands the call off to SBC – SBC is not providing "exchange access" on the call and reciprocal compensation applies.

Charter argues that the MPSC erred in relying on a superseded version of 47 C.F.R. § 51.701(b)(1), as interpreted by the FCC in the 1996 Local Competition Order, 11 F.C.C.R. at 16,013-14, ¶ 1035, in ruling that the MPSC had the authority to decide which carrier's calling area governs for purposes of reciprocal compensation. The key clause of this section defines which traffic is subject to reciprocal compensation. The version of 47 C.F.R. § 51.701(b)(1) in effect from 1996 through 2001 stated:

> Telecommunications traffic between a LEC and a telecommunications carrier other than a [wireless service provider] that originates and terminates within a local service area established by the state commission. (Emphasis added).

The current version of 47 C.F.R. § 51.701(b)(1) states:

> Telecommunications traffic between a LEC and a telecommunications carrier other than a [wireless service provider], except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access. (Emphasis added).

Charter argues that while the MPSC's ruling would be correct under the old rule, which applied reciprocal compensation only to traffic that began and ended within a state-defined, geographic local service area, it is incorrect under the new rule, which makes no mention of geography or state commissions and provides that reciprocal compensation applies to all traffic except for exchange access and information access.

A similar argument to Charter's was squarely rejected in Global NAPs, Inc. v. Verizon New England, Inc., 454 F.3d 91 (2d Cir. 2006). In Global NAPs, the Second Circuit was required to determine, inter alia, whether the Vermont Public Service Board "overstepped its authority in

concluding that Board-determined calling areas govern whether traffic is subject to reciprocal compensation or access charges." Id. at 96-97. Global NAPs contended that "access charges are appropriate only in circumstances where a carrier imposes separate charges for long-distance calls," and because Global NAPs did not impose a separate charge for certain calls, access fees for those calls were inappropriate.[23] Id. at 97. The dispute in Global NAPs, as in this case, concerned which calling area provides the relevant framework for determining proper intercarrier compensation: the ILEC's calling area as determined by the public service commission, or the calling area as determined by the local, originating carrier. Id.

The Second Circuit concluded that despite the "monumental changes" Congress made in telecommunications law, the FCC has indicated its intent to leave authority over defining local calling areas within the jurisdiction of the state commissions:

> Prior to 1996, the state public service commissions defined the boundaries of all local calling areas. See [Local Competition Order], 11 F.C.C. Rcd. 15,499, 16,013-14, ¶ 1035 (1996). With the introduction of competition, however, the state boards were required to consider how to realign the local market to govern competitive entry. The FCC, in its voluminous Local Competition Order, explicitly declined to address the issue of carrier-determined local calling areas, noting that the "state commissions have the authority to determine what geographic areas should be considered 'local areas' for the purpose of applying reciprocal compensation . . . consistent with state commissions' historical practice of defining local service areas for wireline LECs." Id. Importantly, the FCC concluded that it lacked sufficient information to address the issue of expanded local calling area plans but "expect[ed] that this issue [would] be considered, in the first instance, by the state commissions." Id. Thus, despite the monumental changes Congress had made in telecommunications law, the FCC early indicated that it intended to leave authority over defining local calling areas where it always had been--squarely within the jurisdiction of the state commissions.

Global NAPs, 454 F.3d at 97.

---

[23]Global NAPs treated all calls within the State of Vermont as local for billing purposes. Global NAPs, 454 F.3d at 97.

The Second Circuit rejected the argument that a call could not be subject to access charges unless the originating carrier imposed a separate toll charge:

> Global argues that the 1996 Act does not permit the Board to reserve the authority to define local calling areas for intercarrier compensation purposes. It centers its argument on the "separate charge" language in the statutory definition of "telephone toll services" (which in turn defines exchange access, which in turn determines whether access charges apply). Global reasons that, since the regulations prescribe that a charge separate from the applicable service contracts is necessary to make a call a "toll" call and since Global imposes no separate toll charges, its traffic is not subject to access fees, regardless of how the Board defines local calling areas. This argument attributes far too much significance to the term "separate charge."
>
> The underlying statute (which we must remember was originally drafted in 1934) draws sharp distinctions between services known popularly as "local" and "long-distance." See, e.g., 47 U.S.C. § 153(47)-(48). It seems likely that the "separate charge" language in the statute was written to underscore that "tolls" applied exclusively to long-distance service and were charged separately. But what really mattered in determining whether an access charge was appropriate was whether a call traversed local exchanges, not how a carrier chose to bill its customers. Thus, Global's argument that since it imposes no separate fee, its traffic cannot be considered toll traffic, is beside the point.

Global NAPs, 454 F.3d at 98.

The Court affirmed the public service board's conclusion that the calling areas it had established were determinative for purposes of intercarrier compensation, based on the FCC's rulings and congressional intent as expressed in the Act:

> Accordingly, we decline to challenge the Board's conclusion that the calling areas it has established are determinative for the purposes of intercarrier compensation. In fact, the FCC has stated "that state commissions have authority to determine whether calls passing between LECs should be subject to access charges or reciprocal compensation for those areas where the LECs' service areas do not overlap." See In the Matter of Petition of Worldcom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes, 17 F.C.C. Rcd. 27,039, 27,307, ¶ 549 & n.1824 (2002) [Virginia Arbitration Order]. Although much of the Local Competition Order has been superseded, we find nothing in the thousands of pages the FCC has issued on topics relating to local calling areas that clearly and consistently indicates that it intended to preempt the state

commissions' authority to define local calling areas for the purposes of intercarrier compensation. Our understanding, which is consistent with conclusions that other courts have reached, is that the FCC has not disturbed the states' traditional authority to define local calling areas. See, e.g., Iowa Network Servs. v. Qwest Corp., 385 F.Supp.2d 850, 858-59 (S.D. Iowa 2005); Sprint-Fla, Inc. v. Jaber, 885 So.2d 286, 293-94 (Fla. 2004). This understanding also appears to be consistent with Congress's intent in the 1996 Act. See, e.g., 47 U.S.C. § 261(b)-(c) ("[n]othing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part" and "[n]othing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part").

Global NAPs, 454 F.3d at 98-99.

Finally, the Second Circuit expressed concern that if competing carriers were permitted to define local calling areas for purposes of intercarrier compensation, ILECS would eventually be required to absorb all of the infrastructure costs while CLECs reaped all of the profits:

> Allowing the state-commission-determined local calling areas to govern intercarrier compensation also makes good practical sense. Carriers may prescribe markedly different local calling areas in accordance with marketing considerations. This diversity may promote consumer choice and ultimately be beneficial to consumers. But, if carriers were free to define local calling areas for the purposes of intercarrier compensation, the door would be open to overweening conduct by the CLECs. ILECs are currently fixed in state-commission-imposed regimes and, in that framework, provide the infrastructure for CLECs. Local calling areas defined by CLECs would permit such areas to be so broad as to eliminate all intercarrier compensation for ILECs. Permitting CLECs to define local service areas and thereby set the rules for the sharing of infrastructure would eventually require ILECs to absorb all the costs and allow CLECs to reap all the profits.

Id., 454 F.3d at 99.

The Court finds the Second Circuit's reasoning persuasive, particularly in light of the FCC's 2002 ruling that state commissions retain the authority to determine whether access charges or reciprocal compensation apply when LECs' service areas do not overlap. See Virginia Arbitration

<u>Order</u>, 17 F.C.C.R. at 27,307, ¶ 549.  In addition, in the 2001 <u>ISP Remand Order</u> that precipitated the rule amendment on which Charter relies, the FCC stated that reciprocal compensation is not due for "access services," which uniformly "connect calls that travel to points – both interstate and intrastate – <u>beyond the local exchange</u>."  <u>ISP Remand Order</u>, 16 F.C.C.R. at 9168, ¶ 37 (emphasis added).  Further, as SBC notes, the <u>ISP Remand Order</u> and the rule amendment were prompted by a completely different problem not at issue here – the abuse of reciprocal compensation by CLECs marketing largely to Internet Service Providers.[24]  <u>See</u> <u>ISP Remand Order</u>, 16 F.C.C.R. at 9183, ¶ 71. The <u>ISP Remand Order</u> was intended to address this specific problem consistent with a prior federal court remand, and not to undermine long-standing state commission authority in the manner Charter suggests.  The <u>Virginia Arbitration Order</u> ruling makes clear that neither the <u>ISP Remand Order</u> nor the amendment to 47 C.F.R. § 51.701(b)(1) deprives state commissions of the authority to establish local calling areas for purposes of reciprocal compensation and access charges.

**<u>Conclusion</u>**.

For these reasons, the Court concludes that the MPSC's decision to use the local calling areas defined in SBC's MPSC-approved local exchange tariffs to determine whether reciprocal compensation or access charges are appropriate for completing particular calls does not conflict with federal law.  The Arbitration Order should therefore be affirmed on this issue and Charter's motion for summary judgment should be denied.

---

[24]Internet Service Providers ("ISPs") normally receive calls from, but do not place calls to, their dial-up customers, and those calls tend to last for long periods of time.  By targeting ISPs as customers, but not ordinary private callers, CLECs could receive enormous and unearned reciprocal compensation windfalls from ILECs, which the FCC described as undermining "the operation of competitive markets" and hindering "viable, long-term competition."  <u>ISP Remand Order</u>, 16 F.C.C.R. at 9183, ¶ 71.

## V.

<u>**Summary and Conclusion**</u>.

For the foregoing reasons, the Court concludes that (1) it has subject matter jurisdiction over this matter and the Missouri Public Service Commission's motion to dismiss for lack of subject matter jurisdiction should be denied; (2) the MPSC's motions to strike should be denied; (3) Southwestern Bell Telephone, L.P.'s motion for summary judgment should be granted in part and denied in part as set forth in this Memorandum and Order; (4) Sprint Communications Company, L.P.'s motion for summary judgment should be granted; and (5) Charter Fiberlink-Missouri, LLC's motion for summary judgment should be denied.

Accordingly,

**IT IS HEREBY ORDERED** that the Missouri Public Service Commission's motion to dismiss for lack of subject matter jurisdiction is **DENIED**. [Doc. 48]

**IT IS FURTHER ORDERED** that the Missouri Public Service Commission's motions to strike directed to portions of Southwestern Bell Telephone, L.P.'s Complaint and portions of Charter Fiberlink-Missouri, LLC's Counterclaim/Cross-claim are **DENIED**. [Doc. 50, 73]

**IT IS FURTHER ORDERED** that plaintiff Southwestern Bell Telephone L.P.'s motion for summary judgment is **GRANTED in part** and **DENIED in part**; the motion is **GRANTED** with respect to SBC's contention that the MPSC lacks jurisdiction to order § 271 unbundling obligations to be included as part of interconnection agreements arbitrated pursuant to § 252, and that the Arbitration Order is preempted by federal law in this regard (Issue 1); the motion is **DENIED** with respect to (1) SBC's claims concerning access to entrance facilities for interconnection purposes at TELRIC rates pursuant to 47 U.S.C. § 251(c)(2) (Issue 2); (2) SBC's claims concerning reciprocal

compensation for IP-to-PSTN traffic (Issue 3); and (3) all claims asserted in SBC's Complaint which were not included in its motion for summary judgment. [Doc. 84]

**IT IS FURTHER ORDERED** that defendant Sprint Communications Company, L.P.'s cross-motion for summary judgment is **GRANTED** on ¶¶ 50.h., 50.j., and 50.k. of SBC's Complaint. [Doc. 91]

**IT IS FURTHER ORDERED** that defendant/counter-claimant/cross-claimant Charter Fiberlink-Missouri, L.L.C.'s motion for summary judgment is **DENIED**. [Doc. 85]

**IT IS FURTHER ORDERED** that the Missouri Public Service Commission's Arbitration Order dated July 11, 2005 is contrary to federal law and preempted to the extent that it orders 47 U.S.C. § 271 unbundling obligations to be included as part of Southwestern Bell Telephone, L.P.'s interconnection agreements arbitrated pursuant to 47 U.S.C. § 252, including the requirements that SBC (1) fill new orders for unbundled local switching or the network elements which together comprise the UNE Platform, and (2) continue offering unbundled access to de-listed network elements.

**IT IS FINALLY ORDERED** that the Arbitration Order dated July 11, 2005 is otherwise **AFFIRMED**.

An appropriate declaratory judgment and permanent injunction will accompany this memorandum and order.

                                              **CHARLES A. SHAW**
                                              **UNITED STATES DISTRICT JUDGE**

Dated this  14th  day of September, 2006.